Benjamin Barber
Plaintiff
E-mail:barberb@barberb.com
Phone 9712700855

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

**BENJAMIN BARBER,**                              Case No.3:2016cv02105

      Plaintiff,

                              **Memorandum in Support of Claim 2**

      vs.

                              (Civil Rights) 42 USC 1983, First Amendment,

**MEAGAN VANCE ELLEN ROSENBLUM,**                   Fourteenth Amendment, 42 USC 1981,

**KATE BROWN, BEN CANNON, in their**                       42 USC 1985, 42 USC § 13981,

**official capacity (for claim #4 only)**

      Defendants

## Table of Contents

**(I) Facts**
**(II) Claims**
 **(a) Vance committed interstate domestic violence**
 **(b) Failure to train regarding VAWA obligations**
 **(c) State Aided and Abetted Vance**
 **(d) Legal Abuse**
 **(e) Gender Motivations of Defendants.**
**(III) Relief Sought**
**(IV) Legal Principles Applied**
 **(a) Violence Against Women Act**
 **(b) Intimate Partner Violence**
 **(c) Racketeering**
 **(d) The Right to Marry as a Natural Right**
 **(e) The Right to Contract**
 **(f) The Federal Arbitration Act**

## (I) Facts

1.   Plaintiff married Defendant Vance in December 23rd 2011, and they did sign a prenuptial agreement, in it were provisions for mental and physical health and safety. Plaintiff did understand that Defendant Vance had a history of mental health problems and physical disabilities, she initiated romantic conduct with Plaintiff because he too also had physical disabilities notably to low vision.

2.   Some of the mental health issues stemmed from previous familial sexual abuse and rape she alleged to have occurred, including a alleged incident of stranger rape one a week prior to marriage, which was what led defendant to insist of getting married as to not have children out of wedlock.

3.   During the course of the relationship defendant Vance expressed that her social anxiety and physical damage from sex abuse, had prevented her from enjoying sexual behavior and so was interested in producing pornography, rape fantasies, group sex, and public nudity and exhibitionism.

4.   In December 2010 Vance solicited Barber to engage in exhibitions at a sex theater, made pornography and sought out amateur porn producers, in addition both volunteered as organizers for the world naked bike ride, and she engaged in extramarital affairs with other females.

5.   During the course of the relationship Barber was responsible for taking up the vast majority of responsibilities that defendant Vance was not capable of doing herself, for example keeping up with the homework[1] that she was doing for her undergraduate and graduate degree programs.

6.   There was an agreement between the Barber and Vance, that due to her vision problems she would need to get training in order to be qualified for work. She had been getting free subsidized education as long as she passed her classes paid for by Ohio vocational rehabilitation, Barber helped her in classes by doing some of her homework and take care of most domestic duties.[2]

7.   Defendant Vance's anxieties became worse as her stress increased under physical social or financial difficulties worsened, and she would engage in forms of selective muting, muscle spasms, intrusive thoughts, self harming,[3] suicidal idealization,and she was also occasionally violent and abusive and destroyed property, which she went to OHSU for treatments per our agreement.

8.   Vance told barber "if you loved me then you would force me to get help"[4] in response to her self harm and suicidal idealization, at the time she had been exhibiting negative emtionality from the failure to finish her undergraduate teaching degree even with assistance as well as graduate school.

---

1    Meg Pants - negativity, suicide, then asks for homework help.pdf
2    Huzbot.pdf
3    Meg Pants - suicide threat.pdf
4    Meg Pants - bipolar, force me to get help.pdf

9.   After this instance barber did as she directed him to, namely to force her to get therapy as a result of her behavior, when she had became emotionally disturbed as I tried to describe the mutually exclusive demands to lower HVAC bills with insulation and whether insulation heats a house or not.

10. Defendant Vance was referred to therapy and placed on sertraline 100mg and fluoxetine 45mg, in addition Vance also took large amounts of alcohol and caffeine despite warnings on the medicine bottle, and her behavior was getting worse once she enrolled at Lewis and Clark for treatment, where they practiced critical pedagogy as required by cultural competency requirements.

11. Defendant Vance attended the Lewis and Clark community counseling clinic as a result of her increasingly instable state, which included her self harming and suicidal idealization and physical abuse. She had also been abusing her prescription drugs in addition to drugs and alcohol, which she had been told that she was not supposed to mix together, which is why Barber demanded she get treatment.

12. Barber attended Lewis and Clark after with the defendant after hearing about the things they discussed, and Plaintiff was presented with a "wheel of power and control" that mention "white privilege" "male privilege" and other forms of discrimination of suspect classes, which Barber told the practitioner was wrong and illegal and not as relevant as Vance's admitted drug and domestic abuse.

13. The training is a part of requirements passed by legislature regarding cultural comptetance per ORS 413.450, Oregon Health Authority is the one who determines those cultural competency requirements, which contain guidelines for "power, privilege and oppression across personal identities" and the statue requires that all licensed counselors and therapists take this training.

14. The type of therapy that Vance was undergoing is considered based on "critical pedagogy", and informed with a "feminist neo-marxist praxis"[5], it focuses on themes such as  "ethnocentrism, micro-aggressions, identity, privilege, power, oppression, assumptions and bias", using theories like Critical Pedagogy, Social Justice and Liberation Theology originating from the Jesuit Church.

15. Vance's behavior deteriorated due in part to her treatment by Lewis and Clark, and also due in part to Vance's unabated abuse of alcohol[6] and also her medication, despite the fact Barber was dedicating most of his time and effort to support Vance. Vance told Barber of the patriarchy, that all men have the urge to rape, that he had raped her[7], and she was living with Stockholm syndrome.

16. Barber attended Lewis and Clark colleges Counseling Psychology with the Defendant Vance and despite the fact that Vance had admitted that she was the physical and emotional abuser, he was

---

5    Class and Classism in Family Therapy Praxis.pdf
6    Meg Pants - dogs, colleen, psych crisis.pdf
7    Exhibit 101.PDF

confronted with feminist and liberation psychology literature based on critical theory and feminism, specifically the "circle of power and control" including "white privilege" and "male privilege". [8]

17. In the course of Lewis and Clark applying its "critical social theory" Lewis and Clark's Marriage and family therapy program teaches "patriarchy" and "oppression". However their assumptions on "power and privilege" mean " it is not possible for the therapist to be neutral" and "This would leave therapists forced to choose between conflicting ethical principles".[9]

18. For  Lewis and Clark's counseling psychology department Cultural competency[10] is "Critical theory which published "Class and classism in family therapy praxis: A feminist, neo-Marxist approach"[11], and "applying critical social theories to family therapy practice", their practices rely on the "cultural context" of class, race, and gender as they define, rather than an individuals states of mind.

19. Lewis & Clark's Dean of Counseling Psychology writes "The aim of critical social theorists is to critique and influence the direction of modernity, i.e., systematic attempts to discover universal truths through scientific methods and Western oriented logic. While postmodernists question modernity itself, critical theorists question the failings of modernity to create a just society.".[12]

20. Barber informed his counselor that the handouts that they had provided were not at all relevant to the problems that had been occurring, and were in fact unlawful discrimination against his gender, and then inquired how much the therapist understood about the words "power" and "liberty", and recited the "liberty as a triadic relation" to indicate that liberties are interrelated.[13]

21. Afterwards Meagans counselors had suggested that she purchase tickets to visit a former boyfriend that she lived in Ohio behind Barber's back, and that she focus on romantic relationships outside of marriage, despite the fact she claims her mental illness goes back until she was 11 years old, and the fact that she admitted that she was the primary physical and psychological abuser.

22. In the course of Lewis and Clark applying its "critical social theory" Lewis and Clark's Marriage and family therapy program teaches "patriarchy" and "oppression". However their assumptions on "power and privilege" mean " it is not possible for the therapist to be neutral"[14] and "This would leave therapists forced to choose between conflicting ethical principles".[15]

---

8    Power and control wheel.pdf
9    Teresa McDowell Applying Critical Social Theories to Family Therapy Practice.pdf
10   Psychotherapy_Networker_Cultural_Equity-libre.pdf
11   Class and Classism in Family Therapy Praxis.pdf
12   Teresa McDowell Applying Critical Social Theories to Family Therapy Practice.pdf
13   Positive and Negative Liberty (Stanford Encyclopedia of Philosophy).pdf
14   Nicholas Gunzburg - Messages.pdf
15   Teresa McDowell Applying Critical Social Theories to Family Therapy Practice.pdf

23. Reliance on the gender paradigm known as the "Duluth model" for domestic violence ignores the gender symmetry in domestic violence.[16] Studies of professional psychologists rate have shown that psychologists, irrespective of demographics, rate a hypothetical husband's behavior as more likely to be psychologically abusive and more severe in nature than the wife's use of the same actions[17].

24. In October 2014 Barber attended a training program by Lewis and Clark called the "liberation based healing conference, where the Dean held a talk "unsettling whitestream pedagogy of knowledge students, professionals and educators"[18] and held native American healing rituals for the attendants, and passed out "white privilege" advertisements which were sponsored in by Portland State University.[19]

25. Vance told Barber he wanted him to find a woman for her to have a threesome[20] with on 9/25/13 and that she wanted him to be the "main seducer",[21] which barber responded that he would rather have stability with her[22]. Vance got angry and violent because I invited a neighbor for dinner, and she thought that I was trying  to invite the neighbor[23] to go to the Halloween "erotic ball" without her.

26. Vance was arrested and issued a restraining order against abuse, I requested from the DA that she get offered probation and a mental health evaluation,[24] because she had been having mental and drug abuse problems, but she fled the State of Oregon and went to the State of Ohio instead.

27. While in Ohio Vance committed multiple forms of interstate domestic violence, in the form of criminal coercion and extortion towards Barber and third party harassment. Vance was trying to receive proceeds from their tenant rents and have Barber evicted from their home.[25]

28. She did so by spreading rumors to his tenants and his landlord in attempt to get his tenants to not pay rent,[26] in addition to his landlord to take over the lease on the property and evict barber,[27] when Oregon law requires landlords to protect victims of domestic abuse, and the restraining order explicitly prohibits third party abuse including financial abuse and harassment.

---

16  Dutton-D.G.-Corvo-K.-2007-The-Duluth-Program_-A-flawed-and-data-impervious-paradigm.pdf
17  follingstad abuse men vs women.pdf
18  Unsettling whiteness Lewis and Clark.pdf
19  Liberation based healing sponsors.pdf
20  Meg, cheating, partners, and problems with people.pdf
21  meg wants threesomes.pdf
22  Exhibit 102.PDF
23  meg sex liz the neighbor.pdf
24  Mental Health Court - Multnomah County District AttorneyMultnomah County District Attorney.pdf
25  Portland Police Records Request.pdf
26  Gmail - Eviction.pdf
27  Gmail - Rental Agreement.pdf

PAGE 5 - Memorandum in Support of Claim 2

29. Furthermore Vance spread rumors that Barber of abuse and fraud,[28] in order to have his disabled sister removed from their home[29], while at the same time admitting that she was the primary abuser, in order to have barber's reputation with his family ruined in addition to his business relationships.

30. On multiple occasions Vance threatened barber with arrest unless he signed her divorce agreement,[30] [31]before she had gone through the required counseling which their marriage contract required, as well as required my renumeration to pay her graduate student loans despite the fact barber had been spending his time to perform her educational duties in order to maintain her GPA.

31. Barber requested from the Portland Police and the DA that she had been violating her domestic violence order. While the Violence against Women act was amended to give protection regardless of gender, the State of Oregon still does not protect men by a matter of its policy, though it makes many references to females as victims is does not address female perpetrators and male victims.

32. After Vance's restraining order had elapsed she returned to the State of Oregon, and Barber asked her to return and change therapists, while she was in fact living and renting with a licensed therapist who was a graduate student advisor to the students at Lewis and Clark University.[32] Vance told Barber that she wanted to get back together and move in with him and asked him to leave his current girlfriend, and he did perform despite the fact that she didn't follow through.

33. Vance filed for divorce against the defendant, by an attorney who was paid for by the State of Oregon via Portland State University Legal Aid, and Vance's acquaintances did harass Barber's employer Transfer On-line warning them that he committed "fraud" and "hacking" against Vance.[33]

34. Vance testified under oath that she had made plans with her attorney employed by Portland State University, that they would intend to use the intimate image statue before the law had passed against the Plaintiff., who sent Barber a threat of arrest for harassment if he reported unlawful activity, or for publishing information on the Internet to expose her wrongdoing (unlawful criminal activity).

35. In June of 2015 The state of Oregon passed the ORS 163.472, which was sponsored by Barber's former opponent for Oregon State Representatives, Jennifer Williamson. The law criminalizes uploading pornography to an Internet website unless the person in the video consents to its disclosure, despite it being a content based restriction of speech and inherently suspect under the First Amendment.

---

28  Power of attorney.pdf
29  Meg good mood, wants babies, helping sister, right before another break.pdf
30  Meg - extortion.pdf
31  Hangout with Meagan A Vance - starworks5@gmail.pdf
32  Ann Brady Clarkson.pdf
33  Hangout with Meagan A Vance - starworks5@gmail.pdf

36.  In July of 2015 her acquaintance had publicly informed in public about a conspiracy to "to silence endo (Barber)" by exhorting him with the pornography by spreading porn from his Server on the Internet. Vance had testified that her friends had spread our porn on the Internet in order to protect her, but what presumably for the purpose to prevent him from publishing her wrongdoing.

37. The day after Barber was warned of the conspiracy, Vance told barber she wanted to get back together and had left her current partner, Vance and defendant had sexual intercourse for a weekend before she changed her mind, but her partner Micah Goldstein testified that nothing interfered in their relationship, and she testified to having had no interest of getting back together with Barber.

38. In April of 2016 barber was unable to afford to keep his computer server online, because he did not have enough money to keep it running, considering that he was sleeping in the outside homeless and suicidal for 6 months, and uploaded the bulk of his intellectual property to the Internet. Because he wanted to preserve and publish everything he had ever created to the Internet.

39. In the Intellectual Property contained everything including his computer source code, and images, including his intimate images and videos, because he wanted to leave that behind as a tribute to the life that he had experienced, as a part of the life and memory that barber wanted to leave behind.

40. Vance issued under penalty of perjury and in federal jurisdiction a Copyright Act complaint with the assistance of the Oregon Crime Victims Law Center, a nonprofit mostly funded by the State of Oregon and federal funds, That she was the sole copyright holder of the videos and to have them taken down by the third party websites that the videos had been published to.

41. Barber issued a counter notice to the third party websites saying that the copyright notice was in error, because he was the one who held the copyright to the videos themselves as they were taken in his house and his equipment before he had gotten marred, and an agreement that Barber and Vance had to allow co-ownership of (incl intellectual) property and transparency[34] and computer access.

42. Vance then did call the Washington county district attorney to have the defendant arrested for the Oregon statue for "unlawful dissemination of an intimate image", and submitted a declaration to the release hearing that barber had submitted pornography to her workplace and sent her threats.

43. Vance's Attorney Kebler from Oregon Crime Victims Law Center issued criminal opinions against Barber's motions, as if she were a party to a criminal prosecution as a co-plaintiff.. Kebler and Prosecution moved to exclude evidence which would have provided a defense to Barber, Washington

---

34  Meagan, Agreement for coming back here after hospitalization.pdf

PAGE 7 - Memorandum in Support of Claim 2

County Judge Roberts sentenced barber and told to destroy his intellectual property, despite barber having been informed in court that the state was prevented from doing so under copyright law.

### (II) Claims

44.  Barber Alleges that the programs that he and the Defendant Vance attended, contributed to a gender based animus within Vance[35] on the basis that it focuses on "privilege" "power" "oppression" and "micro-aggressions", that those are in fact not "generally accepted as safe" but serve the purpose to create "social action" and "social change". The treatments are inherently suspect under the establishment clause of the first amendment, because they originate from religious doctrines of "liberation theology" from where the training regiment  "liberation based healing" is derived, and from "critical pedagogy" which was formed by a liberation theologian named Paulo Fiere.

45. The practice of the applying critical social theories run counter to the recommendations of the American Psychological Association, and do not represent clinically sound practice that is generally acccepted as safe, and undergone rigorous scientific peer reviewed evidence based medicine. The effects of the training are to increase negative emotionality, and perceive oneself as a victim,[36] these traits are correlated with depression and anxiety disorders, ones that Vance had reported to OHSU[37]. The purpose of the training from the faculty perspective is to cause "Social transformation toward social justice"[38], and create "an irate tireless minority keen to set brush fires in peoples minds"[39].

46. These practices were a direct result of the State of Oregon requiring "culturally responsive practices" which depart from the accepted methods provided by the {}, instead they require belief and adherence to conflict and critical theory based on neo-marxist presumptions of the family.

47. The beliefs of these critical theorists and marxists are that the family unit is part of a cultural hegemony and superstructure that supports capitalism and the oppression of the proletariat, and these knowledges are so embedded in the superstructure that science itself is biased to support capitalism.

48. Marxists feminists in the 70's formed women's groups[40]  like the "national organization for women" whose purpose it was to liberate women from men, To do this they advocated for a cultural revolution and to destroy monogamy, the patriarch and the family unit, whose stability and financial resources would be supplanted by communist structures like social organizations and the welfare state.

---

35  Justin Launstein - Messages.pdf
36  How Trigger Warnings Are Hurting Mental Health on Campus JONATHAN HAIDT.pdf
37  Exhibit 105.PDF
38  Social Action - About the Journal.pdf
39  How feminists tried to destroy the family Erin Pizzey.pdf
40  Marxist Feminism's Ruined Lives - Mallory Millett.pdf

49. Feminist Researchers have a ideological commitment to the idea that men are almost always the sole perpetrator often conceal evidence that contradicts this belief. Among researchers not committed to that ideology, many  have withheld results showing gender symmetry to avoid becoming victims of vitriolic denunciations and ostracism. Thus, many researchers have published only the data on male perpetrators or female victims, deliberatcly omitting data on female perpetrators and male victims.[41]

50. Teaching this ideology is likely to result in a Münchhausen Syndrome[42] caused by hypervigilance to Traumaphobia. Traumaphobia is fear of fear itself, sensitizing people to the psychological effects of stressors such as crime, terror, and hurtful communications. Paradoxically, increasing knowledge of trauma has does not empower a person, but sensitized us to it thereby amplifying its effects.[43]

51. And when a person is 'primed' with these ideas they will often take upon themselves the role of victim, and will seek out rescuers to punish who they see as the perpetrator. This pattern of behavior is known as "Karpman's Drama Triangle", "Initially, a drama triangle arises when a person takes on the role of a victim or persecutor. This person then feels the need to enlist other players into the conflict. As often happens, a rescuer is encouraged to enter the situation".[44]

52. The Most prominent example of this is the work of Professor Jennifer Freyd of the University of Oregon who purports a "repressed memory" therapy[45], which has been proven can create false memories in people or compel them to comply with the patient thinks the therapist wants to hear, and has been dis proven both scientifically and is now inadmissible as evidence in this court.[46]

53. Now her focus of study is institutional betrayal, for example she pressured the University of Oregon institutional research board, to adopt a study that was an on-line poll delivered to people, which had no method of controlling for sample bias,[47] as purported evidence of a sexual assault crisis on campus, and is now suing the University of Oregon for pay discrimination despite her faulty work.[48]

---

41  gender-symmetry-with-gramham-Kevan-Method 8.pdf
42  Munchausen syndrome.pdf
43  Beahrs Traumatophobia Paradoxical Amplification of Posttraumatic Symptoms and the Role of Third Parties.pdf
44  Karpman drama triangle.pdf
45  Repressed memory.pdf
46  False Memory Syndrome Foundation.pdf
47  Scholar's sexual violence study rejected _ City Region _ Eugene, Oregon.pdf
48  Psychology professor sues UO.pdf

54. This is the sort of racketeering that Barber refers to, advocacy groups artificially creating a false dilemma that requires the efforts of their existence, and refusing the accept any sort of evidence that runs contrary to their ideology, because it would threaten their purpose and funding existence and jobs.

55. This is what many people call "pathological altruism"[49], meaning the effort to prevent some harm, can cause more harm than the purported fix. It exploits an fundamental bias[50] of human psychology that attributes negative stimuli from harm twice as strong as the positive stimuli from gains.

56. That is not to say that all advocacy groups are engaging in racketeering, but there is an inherent incentive for them to find positive results, as well as to generate conflict to justify their needs, which also happen to advance the Marxist ideology of destroying the cultural hegemony and patriarchy.

57. Judicial Responses to Restraining Order Requests Discriminate Against Male Victims of Domestic Violence[51] Male victims also report difficulty in locating services specific to their needs, as help lines or shelters are targeted exclusively towards female victims.[52] The underestimation of female violence occurs in police departments to the point where males are disproportionately arrested for equivalent violence as females[53]

58. The State of Oregon failed to accurately train and monitor its employees and contractors that deal with gender motivate intimate partner violence, when they did not issue an interstate arrest warrant for Mrs. Vance for violating a protective order placed against her, when he called the police to report her attempts of extortion and 3rd party harassment.

59. Furthermore employees of the state employed by the university that represented Ms Vance, who prominently display feminist literature on their homepage, conspired to took part in a common scheme to deprive Barber of his first amendment rights to speak about his life, and then informed her of the revenge porn statue, which she subsequently then used to distribute his pornography to exhort him.

60. When Barber wrote to the Oregon Circuit Court in regards to Mrs. Vance's abuse, in addition to the requirement in their marriage contract, which required that they go though couples counseling before divorce, it again infringed on Barbers right to be free from gender motivated violence, by not holding her in contempt for violating a restraining order, and by infringing on his arbitration agreement.

---

49  Sloan Wilson Pathological Altruism.pdf
50  Loss aversion.pdf
51  Do Judicial Responses to Restraining Order Requests Discriminate Against Men.pdf
52  Male Victims of Domestic Violence dutton 2013.pdf
53  Transforming a flawed policy.pdf

61. When barber sought to use the homeless services at the bud clark commons, he was unsuccessful, meanwhile the City of Portland sought to ensure that all women were provided homeless services, which it had not provided to men on the basis that women are victims of men.

62. Barber sought to preserve his documents by using cloud hosting companies and offering them under a creative commons license, he was provided with a copyright complaint by Mrs Vance which was falsely sworn under penalty of purjury the copyright belonged to her when she knew it didnt.

63. She had done in with assistance with a VAWA provider contracted by the State of Oregon called the Oregon Crime Victims Law Center, who attempted to try to simultaneously prosecute the law along with the district attorney, despite the fact that Vance did know her marriage contract agreed to there being transparency, she did not own the copyright, and she herself distributed the pornography.

64. In having performed these actions the state engaged in conflicts of interest with federal and state constitutional and statutory protections of Mr Barber along with other males,[54] and did deprive barber and others of the honest services that they would be eligible had those conflicts of interest not arose.

### (III) Relief Sought

65. Barber seeks compensatory and punitive damages from Ms. Vance and the State of Oregon for infringing on his rights to be free from gender motivated violence, in addition to damages to his lost earning potential and loss of consortium derived gross negligence and deliberate inference in his professional and romantic life arising from the actions performed by both the State and Mrs. Vance.

66. Barber also seeks to enjoin the enter into an stipulated agreement with the State of Oregon, to secularize its institutions in regards to discrimination against men in violation of the violence against women act, through is excessive entanglement of feminist and critical theory prinicpals which create a conflict of interest and prevent the state from providing honest services to members of the state.

### (IV) Legal Principles Applied
### (a) The Violence Against Women Act.

Under 42 USC 13981 in the the Violence Against women Act provides a right from persons: *"All persons within the United States shall have the right to be free from crimes of violence motivated by gender.", "A person (including a person who acts under color of any statute, ordinance, regulation, custom, or usage of any State) who commits a crime of violence motivated by gender and thus deprives another of the right declared in subsection (b) shall be liable to the party injured, in an*

---

54  Oregon Victim Rights Law Center.pdf

*action for the recovery of compensatory and punitive damages, injunctive and declaratory relief, and such other relief as a court may deem appropriate."*

> *"An act or series of acts that would constitute a felony against the person or that would constitute a felony against property if the conduct presents a serious risk of physical injury to another, and that would come within the meaning of State or Federal offenses described in section 16 of title 18, whether or not those acts have actually resulted in criminal charges, prosecution, or conviction and whether or not those acts were committed in the special maritime, territorial, or prison jurisdiction of the United States;"*

Under 18 USC §16  Crime of violence defined The term "crime of violence" means

> *(a) an offense that has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or*
> *(b) any other offense that is a felony and that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.*

In *United States V. Morrison (99-5) 169 F.3d 820*, the court ruled on the legal authority under the commerce clause of the constitution, as well as the equal rights guarantees of the 14th amendment. In short the law can only be enforced insofar as it effects the commerce or a state infringement on and individuals rights. Since the State of Oregon used physical force in the arrest of barber and deprived him of speech, both in the conduct of Meagan Vance's state employed attorney as well as in the actions for the conviction of "revenge porn", which Vance had admittedly attempted to appropriate Barber's property rights. The state of Oregon would be under the jurisdiction of this statue, as it was outlined by the supreme court, due to the circumstances being markedly different than in Morrison.

> *As we observed in Lopez, modern Commerce Clause jurisprudence has "identified three broad categories of activity that Congress may regulate under its commerce power." 514 U.S., at 558 (citing Hodel v. Virginia Surface Mining & Reclamation Assn., Inc., 452 U.S. 264, 276—277 (1981); Perez v. United States, 402 U.S. 146, 150 (1971)). "First, Congress may regulate the use of the channels of interstate commerce." 514 U.S., at 558 (citing Heart of Atlanta Motel, Inc. v. United States, 379 U.S. 241, 256 (1964); United States v. Darby, 312 U.S. 100, 114 (1941)). "Second, Congress is empowered to regulate and protect the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities." 514 U.S., at 558 (citing Shreveport Rate Cases, 234 U.S. 342 (1914); Southern R. Co. v. United States, 222 U.S. 20 (1911); Perez, supra, at 150). "Finally, Congress' commerce authority includes the power to regulate those activities having a substantial relation to interstate commerce, ... i.e., those activities that substantially affect interstate commerce." 514 U.S., at 558—559 (citing Jones & Laughlin Steel, supra, at 37).*

*Petitioners' §5 argument is founded on an assertion that there is pervasive bias in various state justice systems against victims of gender-motivated violence. This assertion is supported by a voluminous congressional record. Specifically, Congress received evidence that many participants in state justice systems are perpetuating an array of erroneous stereotypes and assumptions. Congress concluded that these discriminatory stereotypes often result in insufficient investigation and prosecution of gender-motivated crime, inappropriate focus on the behavior and credibility of the victims of that crime, and unacceptably lenient punishments for those who are actually convicted of gender-motivated violence. See H. R. Conf. Rep. No. 103—711, at 385—386; S. Rep. No. 103—138, at 38, 41—55; S. Rep. No. 102—197, at 33—35, 41, 43—47. Petitioners contend that this bias denies victims of gender-motivated violence the equal protection of the laws and that Congress therefore acted appropriately in enacting a private civil remedy against the perpetrators of gender-motivated violence to both remedy the States' bias and deter future instances of discrimination in the state courts.*

*As our cases have established, state-sponsored gender discrimination violates equal protection unless it " 'serves "important governmental objectives and ... the discriminatory means employed" are "substantially related to the achievement of those objectives." ' " United States v. Virginia, 518 U.S. 515, 533 (1996) (quoting Mississippi Univ. for Women v. Hogan, 458 U.S. 718, 724 (1982), in turn quoting Wengler v. Druggists Mut. Ins. Co., 446 U.S. 142, 150 (1980)). See also Craig v. Boren, 429 U.S. 190, 198—199 (1976). However, the language and purpose of the Fourteenth Amendment place certain limitations on the manner in which Congress may attack discriminatory conduct. These limitations are necessary to prevent the Fourteenth Amendment from obliterating the Framers' carefully crafted balance of power between the States and the National Government. See Flores, supra, at 520—524 (reviewing the history of the Fourteenth Amendment's enactment and discussing the contemporary belief that the Amendment "does not concentrate power in the general government for any purpose of police government within the States") (quoting T. Cooley, Constitutional Limitations 294, n. 1 (2d ed. 1871)). Foremost among these limitations is the time-honored principle that the Fourteenth Amendment, by its very terms, prohibits only state action. "[T]he principle has become firmly embedded in our constitutional law that the action inhibited by the first section of the Fourteenth Amendment is only such action as may fairly be said to be that of the States. That Amendment erects no shield against merely private conduct, however discriminatory or wrongful." Shelley v. Kraemer, 334 U.S. 1, 13, and n. 12 (1948).*

### (b) Intimate Partner Violence

Intimate partner violence (IPV) is a multidimensional construct that requires researchers to measure a variety of different behaviors to further understand how it functions and capture its full range, extent, and severity . The U.S. Centers for Disease Control and Prevention (CDC) identifies four types of IPV: physical violence, sexual violence, threats of physical or sexual violence, and psychological/emotional violence, all of which are associated with emotional harm, distress, mental health concerns, and physical health problems among its victims. One notable absence is the measurement of legal and administrative (LA) aggression, which is defined as the manipulation of legal and administrative

resources in an attempt to control or inflict emotional and financial harm on one's partner.[55]

Women are substantially more likely to exhibit psychological aggression. Similar findings have been reported in other studies. Strauss et al. found that female intimate partners in heterosexual relationships were more likely than males to use psychological aggression, including threats to hit or throw an object.[56] A study of young adults by Giordano et al.found that females in intimate heterosexual relationships were more likely than males to threaten to use a knife or gun against their partner.[57]

Numerous studies done between the 1980 and 1994 report that lesbian relationships have higher overall rates of interpersonal aggression (including psychological aggression/emotional abuse) than heterosexual or gay male relationships. Furthermore, women who have been involved with both men and women reported higher rates of abuse from their female partners.[58]

A predisposition to ascribe expressive, and therefore more benign, motives to female perpetrators compromises a clinician's ability to conduct a proper risk assessment and to fashion a suitable treatment plan. Violent, controlling women who may pose a serious danger to their loved ones and who may benefit from intensive, IPV-focused treatment are not helped when they are remanded to traditional psychotherapy or no therapy at all. When remanded to batterer intervention programs, they are unlikely to be held as accountable as they should be if group facilitators assume that they are "victims fighting back." If presumed "experts" in the field tend to downplay violence by women, they are in essence putting people at risk—both the male victims of these women, as well as their children and the women themselves, who are at increased risk of being assaulted themselves in the context of mutual abuse or by a victim responding in self-defense or retaliation.[59]

However when we use experimental data from a nationally representative sample to examine whether gender and the victim's relationship to the offender affect attitudes about the seriousness of the offense and whether the offense should be reported to the police. We find that respondents are

---

55  Effects of Legal/Administrative Aggression - berger2015.pdf
56  Development and Preliminary Psychometric Data.pdf
57  DELINQUENCY IDENTITY AND WOMENSINVOLVEMENT IN RELATIONSHIP VIOLENCE giordano1999.pdf
58  Intimate Violence in Lesbian Relationships lie1991.pdf
59  Perceptions of Motives in Intimate Partner Violence Hamel, Desmarais & Nicholls (2007).pdf

particularly more likely to condemn men's assaults on women, and to favor reporting them.[60]

Empirical evidence that contradicted the feminist "gender paradigm" claim that intimate partner violence (IPV) was primarily a gender issue. Incidence statistics, we argued, demonstrated that in North America, personality disturbance and not gender, was a better predictor of IPV. All policies that were based on the gender paradigm were, ipso facto, flawed by being improperly premised[61]

The gender paradigm is the view that most domestic violence (DV) is male perpetrated against females (and children) in order to maintain patriarchy. Based on functionalist sociology, it has been the prominent DV perspective in North America and Western Europe, framing criminal justice policy to DV, court understanding of DV, court disposition of DV perpetrators to psychoeducational groups, and custody decisions. Research evidence contradicts every major tenet of this belief system: female DV is more frequent than male DV, even against nonviolent partners, there is no overall relationship of control to DV, and abuse perpetrators who use intimate partner violence (IPV) for coercive instrumental reasons are both male and female.[62]

Compare this to the American Psychological Association (APA) Ethical Guidelines for forensic evaluation summarized in Weissman and DeBow (2003).[63] Forensic evaluation must begin with a "cognitive set and evaluative attitude" of the assessor that is "neutral, objective and detached" (p. 39). Assessors must begin each case with competing hypotheses, roughly equivalent to the two legal positions. They then must testify "truthfully, honestly and candidly and, consistent with applicable legal procedures, describe fairly the bases for their testimony and conclusions[64]

Quite often, the thought of a female offender can be counterintuitive. Our social norms dictate that women are not dangerous—that they do not commit crimes—and the thought of a female offender conflicts with prescribed gender roles: aren't women supposed to be nurturing and passive? If a woman does commit a crime, the common belief is that she is misguided and must have committed the crime

---

60  When a Man Hits a Woman: Moral Evaluations.pdf
61  Dutton-D.G.-Corvo-K.-2007-The-Duluth-Program_-A-flawed-and-data-impervious-paradigm.pdf
62  Gender paradigm anti-science.pdf
63  Forensic_training_and_practice.pdf
64  The Gender Paradigm in Family Court Processes.pdf

because of her own victimization, was under the control of others, or is simply a criminal deviant whose actions strayed from typical "womanly" behavior.[65]

### (c)Racketeering

Furthermore the repeated and intentional acts of the state to aid and abet Ms. Vance in committing crimes against Barber, can be considered to be a pattern of racketeering meant to create a system of advocacy groups, who engage in a pattern of infringing on the rights of men and profiting from the infringement, and doing so with federally assisted funds provided under the violence against women act. This pattern is evidenced as a failure of the State of Oregon to train its agencies on the rights of men, and or regard them as potential victims of domestic abuse or provision protection from that abuse, but  instead often causing them to be victims of forms of legal abuse by its contractors.[66]

The Hobbs Act by its express language makes it a crime to obstruct, delay, or affect commerce by robbery or extortion. While the Hobbs Act is limited to conduct that "obstructs, delays or affects interstate commerce [commerce between two or more states]," this requirement is hardly any requirement at all since all that is needed is a small or practically negligible effect. A Hobbs Act violation may serve as the foundation for RICO offenses.

Racketeer Influenced And Corrupt Organizations Act ("RICO") – 18 USC §1962 In 1970, Congress passed the RICO statute as part of the Organized Crime Control Act. It was designed "to seek the eradication of organized crime by . . . establishing new penal prohibitions, and by providing enhanced sanctions and new remedies to deal with the unlawful activities of those engaged in organized crime." *United States v. Turkette, 452 U.S. 576, 589 (1981).*

§1962(c) makes it unlawful for any person, which includes a public official,"employed by or associated with any enterprise engaged in, or the activities of which affect interstate or foreign commerce, to conduct or participate . . . in the conduct of such enterprise's affairs through a pattern of racketeering activity"; and §1962(d) makes it unlawful for a person to conspire to violate subdivision (c) as well as subdivisions (a) and (b).

The elements of a RICO violation as charged against a public official are that the official:

---

65  Perceptios of Female Offenders, How Stereotypes and Social Norms Affect Criminal Justice Responses.pdf
66  Oregon Victim Rights Law Center.pdf

through the commission of two or more chargeable or indictable or punishable predicate offense. The requisite offenses include mail or wire fraud and Hobbs Acts offenses; constituting a "pattern of racketeering". The statute requires that a pattern include at least two acts of racketeering activity, one of which occurred after the effective date of the statute (October 15, 1970), and the last of which occurred within ten years of a prior act of racketeering activity. The Supreme Court has held that a pattern "requires the showing of a relationship between the predicates, . . . and of the threat of, continuing activity . . ." "Criminal conduct," the Court explained, "forms a pattern if it embraces criminal acts that have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *H.J. Inc. v. Northwestern Bell Tel. Co., 492 U.S. 229, 239-240 (1989).*

"Racketeering activity" includes conduct that is "indictable," "chargeable" or "punishable" under various state and federal criminal laws. The acts of racketeering activity are also referred to as predicate offenses, and the list incorporated into the statute covers a wide array of illegal activity, including mail and wire fraud, and Hobbs Act offenses, Directly or indirectly invests in, maintains an interest in, participates in, conducts the affairs of, or acquires income used to acquire an interest in, an enterprise, An enterprise includes any individual partnership, corporation, other legal entities or group of individuals or entities associated in fact, which encompasses a government office through which the official(s) conducted the racketeering activities. The activities of which affect interstate or foreign commerce, This provision has been liberally construed so that nearly any interstate involvement would satisfy the statute. It is difficult to conceive of a government office in the United States whose activities would not be construed as affecting interstate commerce.

Mail and Wire Fraud – 18 USC §§1341 (Mail), 1343 (Wire) The mail and wire fraud statutes were enacted as anti-fraud statutes, designed to combat as criminal the common law crime of larceny by trick. Even thought the statutes' terms do not specifically embrace corruption, they are extensively used to prosecute acts of public corruption.  for wire fraud, the Plaintiff must prove only (a) a scheme to defraud, and (b) the use of interstate wire communications in furtherance of the scheme. The requisite wire communications include radio transmissions, telephone calls and e-mails. Significantly, the requisite mailing or wiring need not itself contain any fraudulent information and may be entirely innocent. However, they must be shown to be at least a "step" in the scheme. *(Schmuck v. United*

*States, 489 U.S. 705, 712 [1989])*.  With respect to the statutes' use in public corruption cases, a fraudulent scheme includes "a scheme . . . to deprive another of the intangible right of "honest services." (18 USC §1346).

Generally, the federal circuit courts have adhered to one of two approaches when dealing with honest services fraud cases. One, the "reasonably foreseeable economic harm" test, requires that the defendant intentionally breached his fiduciary duty and "foresaw or reasonably should have foreseen" that his actions could cause economic harm to his victim. The other, the "materiality" test, requires that the defendant possessed a fraudulent intent and made "any misrepresentation that has the natural tendency to influence or is capable of influencing" the victim to change his behavior. However, the First, Fourth, Ninth, and Eleventh Circuit Courts have all held that the federal statute does not limit the meaning of "honest services" to violations of state law. As the Ninth Circuit decided in *Weyrauch v. United States 561 US (2010):*

> Because laws governing official conduct differ from state to state, conditioning mail fraud convictions on state law means that conduct in one state might violate the mail fraud statute, whereas identical conduct in a neighboring state would not. Congress has given no indication it intended the criminality of official conduct under federal law to depend on geography.

In 2006, the United States Court of Appeals for the Ninth Circuit treated the issue of whether private defendants could be prosecuted under § 1346 as settled law, citing the numerous other circuits which had affirmed the practice. In the case United States v. Williams, the defendant, John Anthony Williams, was an Oregon insurance salesman who had sold several annuities to an elderly rancher named Loyd Stubbs. When Stubbs liquidated his annuities, Williams deposited the resulting funds in a joint bank account he had opened in his and Stubbs' names. Williams proceeded to make massive cash withdrawals from the account, depositing the money in his own personal account and spending much of it; he also wired money to personal bank accounts he had in Belize and Louisiana. Williams was convicted of four counts of wire fraud, three counts of mail fraud, three counts of money laundering, and one count of foreign transportation of stolen money; the fraud charges stemmed from schemes to defraud Stubbs of money and of Williams' honest services as his financial advisor. On appeal, Williams argued that § 1346 did not apply to private commerce. The court disagreed, and, citing previous case law, ruled that within a fiduciary relationship the statute applied.

*Skilling v. United States, 561 U.S. 358 (2010)* clarified "honest services" fraud, and limited the criminal due process rights of defendants for vagueness, but not addressing the civil liability of the law.

> "Unlike traditional fraud, in which the victim's loss of money or property supplied the defendant's gain, with one the mirror image of the other, the honest services doctrine targeted corruption that lacked similar symmetry. While the offender profited, the betrayed party suffered no deprivation of money or property; instead, a third party, who had not been deceived, provided the enrichment. Even if the scheme occasioned a money or property gain for the betrayed party, courts reasoned, actionable harm lay in the denial of that party's right to the offender's "honest services"

### (d) The Right to Marry as a Natural Right

In *Obergefell v. Hodges, 576 U.S. (2015)* the supreme court recognized that the right to marry was an inalienable right, one which should place the standard of review of any attempts of the state of oregon to violate contractual obligations and rights under strict scrutiny. The state of oregon did do this when it first denied Barber the right granted to him by his contract to go through marital counseling as an arbitration method. In addition it also did so when it tried to convert the agreement of transparency by both parties into an expectation of privacy, both in regards to the publications of the chat logs between barber and vance in addition to their pornography. In doing so it deprived barber of the intangible right of "honest services" in regards to performance of marital duties and products of speech.

> *The fundamental liberties protected by the Fourteenth Amendment's Due Process Clause extend to certain personal choices central to individual dignity and autonomy, including intimate choices defining personal identity and beliefs. See, e.g., Eisenstadt v. Baird, 405 U. S. 438, 453; Griswold v. Connecticut, 381 U. S. 479, 484–486. Courts must exercise reasoned judgment in identifying interests of the person so fundamental that the State must accord them its respect. History and tradition guide and discipline the inquiry but do not set its outer boundaries. When new insight reveals discord between the Constitution's central protections and a received legal stricture, a claim to liberty must be addressed.*
>
> *For example, marriage was once viewed as an arrangement by the couple's parents based on political, religious, and financial concerns; but by the time of the Nation's founding it was understood to be a voluntary contract between a man and a woman. See N. Cott, Public Vows: A History of Marriage and the Nation 9–17 (2000); S. Coontz, Marriage, A History 15–16 (2005). As the role and status of women changed, the institution further evolved. Under the centuries-old doctrine of coverture, a married man and woman were treated by the State as a single, male-dominated legal entity. See 1 W. Blackstone, Commentaries on the Laws of England 430 (1765). As women gained legal, political, and property rights, and as society began to understand that women have their own equal dignity, the law of coverture was abandoned. See Brief for Historians of Marriage et al. as Amici Curiae 16–19. These and other developments in the institution of marriage over the past centuries were not mere superficial changes.*

PAGE 19 - Memorandum in Support of Claim 2

*Four principles and traditions demonstrate that the reasons marriage is fundamental under the Constitution apply with equal force to same-sex couples. The first premise of this Court's relevant precedents is that the right to personal choice regarding marriage is inherent in the concept of individual autonomy. This abiding connection between marriage and liberty is why Loving invalidated interracial marriage bans under the Due Process Clause. See 388 U. S., at 12. Decisions about marriage are among the most intimate that an individual can make. See Lawrence, supra, at 574. This is true for all persons, whatever their sexual orientation.*

*A second principle in this Court's jurisprudence is that the right to marry is fundamental because it supports a two-person union unlike any other in its importance to the committed individuals. The intimate association protected by this right was central to Griswold v. Connecticut, which held the Constitution protects the right of married couples to use contraception, 381 U. S., at 485, and was acknowledged in Turner, supra, at 95. Same-sex couples have the same right as opposite-sex couples to enjoy intimate association, a right extending beyond mere freedom from laws making same-sex intimacy a criminal offense. See Lawrence, supra, at 567.*

*A third basis for protecting the right to marry is that it safeguards children and families and thus draws meaning from related rights of childrearing, procreation, and education. See, e.g., Pierce v. Society of Sisters, 268 U. S. 510. Without the recognition, stability, and predictability marriage offers, children suffer the stigma of knowing their families are somehow lesser. They also suffer the significant material costs of being raised by unmarried parents, relegated to a more difficult and uncertain family life. The marriage laws at issue thus harm and humiliate the children of same-sex couples. See Windsor, supra, at ___. This does not mean that the right to marry is less meaningful for those who do not or cannot have children. Precedent protects the right of a married couple not to procreate, so the right to marry cannot be conditioned on the capacity or commitment to procreate.*

*Finally, this Court's cases and the Nation's traditions make clear that marriage is a keystone of the Nation's social order. See Maynard v. Hill, 125 U. S. 190, 211. States have contributed to the fundamental character of marriage by placing it at the center of many facets of the legal and social order. There is no difference between same- and opposite-sex couples with respect to this principle, yet same-sex couples are denied the constellation of benefits that the States have linked to marriage and are consigned to an instability many opposite-sex couples would find intolerable. It is demeaning to lock same-sex couples out of a central institution of the Nation's society, for they too may aspire to the transcendent purposes of marriage.*

*The right to marry is a fundamental right inherent in the liberty of the person, and under the Due Process and Equal Protection Clauses of the Fourteenth Amendment couples of the same-sex may not be deprived of that right and that liberty. Same-sex couples may exercise the fundamental right to marry. Baker v. Nelson is overruled. The State laws challenged by the petitioners in these cases are held invalid to the extent they exclude same-sex couples from civil marriage on the same terms and conditions as opposite-sex couples.*

### (e) The Right to Contract

The Contract Clause appears in the United States Constitution, Article I, section 10, clause 1. It states:

*No State shall enter into any Treaty, Alliance, or Confederation; grant Letters of Marque and Reprisal; coin Money; emit Bills of Credit; make any Thing but gold and silver Coin a Tender in Payment of Debts; pass any Bill of Attainder, ex post facto Law, or Law impairing the Obligation of Contracts, or grant any Title of Nobility.*

The Supreme Court laid out a three-part test for whether a law conforms with the Contract Clause in *Energy Reserves Group v. Kansas P. & L. Co., 459 U.S. 400 (1983*. First, the state regulation must not substantially impair a contractual relationship. Second, the State "must have a significant and legitimate purpose behind the regulation, such as the remedying of a broad and general social or economic problem." Third, the law must be reasonable and appropriate for its intended purpose. This test is similar to rational basis review.

The Fourteenth Amendment's due process clause protects against the deprivation of life, liberty or property without the due process of law. As Justice Peckham noted in his unanimous opinion in *Allgeyer v. Louisiana, 165 U.S. 578, 589 (1897)*, the "liberty" interest protected is not: only the right of the citizen to be free from . .. physical restraint ... but the term is deemed to embrace the right of the citizen to be free in the enjoyment of all his faculties; to use them in all lawful ways; to live and work where he will; to earn his livelihood by any lawful calling; to pursue any livelihood or avocation; and for that purpose to enter into all contracts which may be proper, necessary, and essential to his carrying out to a successful conclusion the purposes above mentioned.

Avoiding rational basis analysis is therefore required to infringe the freedom to contract. If the general right to contract is classified as fundamental, any encroachments on that right must pass a higher level of review. When fundamental rights are affected or the challenged regulation is arbitrary or discriminatory, a strict scrutiny test is used and the laws or regulations will be held invalid unless they are necessary to achieve a compelling governmental interest and are narrowly tailored to do so, a much more difficult test. Whereas laws reviewed on a rational basis are nearly always upheld, laws examined with strict scrutiny are nearly always struck down. The question of whether the freedom to contract is a fundamental right may be dispositive in the case. Assuming the general right to contract is a fundamental right, any infringement on it especially like the one in Oregon's law, is likely to face strict scrutiny given its alleged discriminatory intent and be invalidated.

In this case the questioned right is the individual's freedom to contract, meaning the individual's

general ability to obligate himself and receive obligations in return from another. Several factors point to the conclusion that the freedom to contract described here is a fundamental right. First, the freedom to contract was a prime component of the common law legal system upon which our country was founded, making the right "deeply rooted in this Nation's history and tradition." Second, the broad scope and usage of the general freedom to contract in our society strongly suggests that the right is perceived as a universal or fundamental right by all members of our society. Third, the general freedom to contract is intimately connected to several other fundamental rights including among others the right to contract for marriage,[257] private education,[258] and presumably the right to purchase and use contraceptive devices.[259] Any law abrogating the general right to contract will necessarily infringe on these previously recognized fundamental rights. Finally, based solely on pragmatism, an advanced commercial society could not be sustained without the ability to contract for future obligations and rights.

Most people never consider the importance of the right to contract, which is essentially the ability to gain and dispose of possessions and services, alter legal relationships, and act with some guaranty as to future obligations and rights. It is not until one is faced with the prospect of not having that right that its value becomes more readily apparent. To be sure, this article is not arguing for a return to Lochnerian jurisprudence based on a laissez faire approach to the market in which wage and hour laws, child labor laws, and the like were invalidated as impositions on the "freedom of contract." Rather, the freedom to contract argued for is the basic right of an individual to enter into agreements that gain or dispose of possessions, services or otherwise alter legal relationships. As Justice Thompson noted in 1827, the obligation of contract "springs from a higher source: from those great principles of universal law, which are binding on societies of men as well as on individuals."

### (f) The Federal Arbitration Act

The Federal Arbitration Act (FAA) "embodies a national policy favoring arbitration and places arbitration agreements on equal footing with all other contracts." As interpreted by the Supreme Court, the FAA creates a uniform "'body of federal substantive law'" regulating the enforceability of agreements to arbitrate that applies to all contracts involving interstate commerce in both state and federal court.

Given the broad interpretation of interstate commerce adopted by the Supreme Court, the FAA will apply to most every contract. However, the FAA does not necessarily dictate the procedural rules governing how arbitration itself is conducted. Rather, the parties to a contract are free to elect whether the FAA, state law, or other rules -- such as those promulgated by an independent ADR provider -- will govern their arbitration.

Federal Preemption The FAA contains no express preemptive provision, nor does it reflect a congressional intent to occupy the entire field of arbitration. Nevertheless, the Supreme Court has applied the FAA to preempt state laws that "undermine the goals and policies of the FAA." Thus, while "state law may be applied if that law arose to govern issues concerning the validity, revocability, and enforceability of contracts generally," courts may not "invalidate arbitration agreements under state laws applicable only to arbitration provisions."

Following this approach, the Supreme Court has applied the FAA to preempt state laws that bar arbitration of particular disputes. For example, in Perry v. Thomas, the Supreme Court held that the FAA preempted a California law permitting employees to sue for unpaid wages even where the parties had entered into an enforceable agreement to arbitrate. Similarly, in S*outhland Corp. v. Keating 465 u.s. 1 (1984)*, the Supreme Court held that the FAA preempted a California law barring arbitration of certain state statutory claims.

The Supreme Court has also applied the FAA to preempt state laws that impose special conditions on the enforceability of agreements to arbitrate. Thus, in Doctor's Associates, Inc. v. Casarotto 517 U.S. 681 (1996), the Supreme Court held that the FAA preempted a Montana law requiring arbitration clauses to be typed in capital letters, to be underlined, and to appear on the first page of the contract.8 The Supreme Court found that the statute directly conflicted with the federal mandate that agreements to arbitrate "be placed upon the same footing as other contracts" because it "condition[ed] the enforceability of arbitration agreements on compliance with a special notice requirement not applicable to contracts generally."

The goals and policies underlying the FAA have also led the Supreme Court to hold that "as a matter of substantive federal arbitration law, an arbitration provision is severable from the remainder of

the contract." Under this rule, an agreement to arbitrate is enforceable even if the contract as a whole is void or otherwise unenforceable. State laws that do not recognize the "rule of severability" are preempted even if they declare all parts of a void contract unenforceable without distinguishing agreements to arbitrate. As a practical matter, the rule means that the arbitrator, not the court, must decide any challenge going to the validity or enforceability of the contract as a whole.

*Volt Information Sciences v. Stanford University 489 U.S. 468 (1989)* is instructive. In that case, the parties entered into a construction contract whereby Volt was to install a system of electrical conduits at the University in California. The contract included an arbitration provision providing that any claims arising out of the contract would be arbitrated "in accordance with the Construction Industry Arbitration Rules of the American Arbitration Association." The arbitration clause did not separately specify whether it was governed by the FAA's procedural rules or by state law. The contract did, however, include a general choice-of-law clause that called for application of "the law of place where the Project is located."

A dispute arose, and Volt made a demand for arbitration. The University responded by suing Volt in California state court. The University also sought indemnity from two other companies that were involved in the construction project, neither of whom had agreed to arbitrate. Volt moved to stay the litigation and compel arbitration under the FAA. The University moved to stay arbitration under § 1281.2(c) of the California Code of Civil Procedure which permits a court to stay arbitration pending resolution of related litigation. Applying § 1281.2(c), the trial court stayed the arbitration.[67]

Dated: May 12, 2017                    /s/_____

Ben Barker

**Table of Authorities**
United States V. Morrison (99-5) 169 F.3d 820
Schmuck v. United States, 489 U.S. 705, 712 (1989)
Skilling v. United States, 561 U.S. 358 (2010)
Obergefell v. Hodges, 576 U.S. (2015)
Weyhrauch v. United States 561 US (2010)
Energy Reserves Group v. Kansas P. & L. Co., 459 U.S. 400 (1983)
Allgeyer v. Louisiana, 165 U.S. 578, 589 (1897)

[67]

Southland Corp. v. Keating 465 u.s. 1 (1984)
Volt Information Sciences v. Stanford University 489 U.S. 468 (1989)
Doctor's Associates, Inc. v. Casarotto 517 U.S. 681 (1996)
H.J. Inc. v. Northwestern Bell Tel. Co., 492 U.S. 229, 239-240 (1989)
United States v. Turkette, 452 U.S. 576, 589 (1981)
**Table of citations**

**Table of Statues**

## 18 U.S. Code § 2261 - Interstate domestic violence

*(a) Offenses.—*
*(1)Travel or conduct of offender.—*
*A person who travels in interstate or foreign commerce or enters or leaves Indian country or is present within the special maritime and territorial jurisdiction of the United States with the intent to kill, injure, harass, or intimidate a spouse, intimate partner, or dating partner, and who, in the course of or as a result of such travel or presence, commits or attempts to commit a crime of violence against that spouse, intimate partner, or dating partner, shall be punished as provided in subsection (b).*

## 18 U.S. Code § 2261A - Stalking

*Whoever—*
*(1) travels in interstate or foreign commerce or is present within the special maritime and territorial jurisdiction of the United States, or enters or leaves Indian country, with the intent to kill, injure, harass, intimidate, or place under surveillance with intent to kill, injure, harass, or intimidate another person, and in the course of, or as a result of, such travel or presence engages in conduct that—*
*(B) causes, attempts to cause, or would be reasonably expected to cause substantial emotional distress to a person described in clause (i), (ii), or (iii) of subparagraph (A); or*
*(2) with the intent to kill, injure, harass, intimidate, or place under surveillance with intent to kill, injure, harass, or intimidate another person, uses the mail, any interactive computer service or electronic communication service or electronic communication system of interstate commerce, or any other facility of interstate or foreign commerce to engage in a course of conduct that—*
*(B) causes, attempts to cause, or would be reasonably expected to cause substantial emotional distress to a person described in clause (i), (ii), or (iii) of paragraph (1)(A),*

## 18 U.S. Code § 2262 - Interstate violation of protection order

*(a) Offenses.—*
*(1)Travel or conduct of offender.—*
*A person who travels in interstate or foreign commerce, or enters or leaves Indian country or is present within the special maritime and territorial jurisdiction of the United States, with the intent to engage in conduct that violates the portion of a protection order that prohibits or provides protection against violence, threats, or harassment against, contact or communication with, or physical proximity to, another person, or that would violate such a portion of a*

*protection order in the jurisdiction in which the order was issued, and subsequently engages in such conduct, shall be punished as provided in subsection (b). described in clause (i), (ii), or (iii) of paragraph (1)(A),*

## 18 U.S. Code § 873 - Blackmail

*Whoever, under a threat of informing, or as a consideration for not informing, against any violation of any law of the United States, demands or receives any money or other valuable thing, shall be fined under this title or imprisoned not more than one year, or both.*

## 18 U.S. Code § 875 - Interstate communications

*(d) Whoever, with intent to extort from any person, firm, association, or corporation, any money or other thing of value, transmits in interstate or foreign commerce any communication containing any threat to injure the property or reputation of the addressee or of another or the reputation of a deceased person or any threat to accuse the addressee or any other person of a crime, shall be fined under this title or imprisoned not more than two years, or both.*

## 18 U.S. Code § 880 - Receiving the proceeds of extortion

*A person who receives, possesses, conceals, or disposes of any money or other property which was obtained from the commission of any offense under this chapter that is punishable by imprisonment for more than 1 year, knowing the same to have been unlawfully obtained, shall be imprisoned not more than 3 years, fined under this title, or both.*

## 18 U.S. Code § 1346 - Definition of "scheme or artifice to defraud"

*For the purposes of this chapter, the term "scheme or artifice to defraud" includes a scheme or artifice to deprive another of the intangible right of honest services.*

## 18 U.S. Code § 1343 - Fraud by wire, radio, or television

*Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both. If the violation occurs in relation to, or involving any benefit authorized, transported, transmitted, transferred, disbursed, or paid in connection with, a presidentially declared major disaster or emergency (as those terms are defined in section 102 of the Robert T. Stafford Disaster Relief and Emergency Assistance Act (42 U.S.C. 5122)), or affects a financial institution, such person shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.*

## 18 U.S. Code § 1341 - Frauds and swindles

*Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail or such carrier according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined under this title or imprisoned not more than 20 years, or both. If the violation occurs in relation to, or involving any benefit authorized, transported, transmitted, transferred, disbursed, or paid in connection with, a presidentially declared major disaster or emergency (as those terms are defined in section 102 of the Robert T. Stafford Disaster Relief and Emergency Assistance Act (42 U.S.C. 5122)), or affects a financial institution, such person shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.*

## 18 U.S. Code § 1349 - Attempt and conspiracy

*Any person who attempts or conspires to commit any offense under this chapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy.*

## 18 U.S. Code § 1621 - Perjury generally

*Whoever—*
*(1) having taken an oath before a competent tribunal, officer, or person, in any case in which a law of the United States authorizes an oath to be administered, that he will testify, declare, depose, or certify truly, or that any written testimony, declaration, deposition, or certificate by him subscribed, is true, willfully and contrary to such oath states or subscribes any material matter which he does not believe to be true; or*

*(2) in any declaration, certificate, verification, or statement under penalty of perjury as permitted under section 1746 of title 28, United States Code, willfully subscribes as true any material matter which he does not believe to be true; is guilty of perjury and shall, except as otherwise expressly provided by law, be fined under this title or imprisoned not more than five years, or both. This section is applicable whether the statement or subscription is made within or without the United States.*

## 18 U.S. Code Chapter 95 - RACKETEERING

## § 1951 - Interference with commerce by threats or violence

*(a) Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to*

*do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined under this title or imprisoned not more than twenty years, or both.*

*(b) As used in this section—*
*(1) The term "robbery" means the unlawful taking or obtaining of personal property from the person or in the presence of another, against his will, by means of actual or threatened force, or violence, or fear of injury, immediate or future, to his person or property, or property in his custody or possession, or the person or property of a relative or member of his family or of anyone in his company at the time of the taking or obtaining.*
*(2) The term "extortion" means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right.*
*(3) The term "commerce" means commerce within the District of Columbia, or any Territory or Possession of the United States; all commerce between any point in a State, Territory, Possession, or the District of Columbia and any point outside thereof; all commerce between points within the same State through any place outside such State; and all other commerce over which the United States has jurisdiction.*

## 18 U.S. Code § 1961 - Definitions

*As used in this chapter—*
*(1) "racketeering activity" means*
*(A) any act or threat involving murder, kidnapping, gambling, arson, robbery, bribery, extortion, dealing in obscene matter, or dealing in a controlled substance or listed chemical (as defined in section 102 of the Controlled Substances Act), which is chargeable under State law and punishable by imprisonment for more than one year;*
*(B) any act which is indictable under any of the following provisions of title 18, United States Code: section 1029 (relating to fraud and related activity in connection with access devices), section 1341 (relating to mail fraud), section 1343 (relating to wire fraud), section 1503 (relating to obstruction of justice), section 1510 (relating to obstruction of criminal investigations), section 1511 (relating to the obstruction of State or local law enforcement), section 1512 (relating to tampering with a witness, victim, or an informant), section 1513 (relating to retaliating against a witness, victim, or an informant), section 1951 (relating to interference with commerce, robbery, or extortion), section 1952 (relating to racketeering), section 2318 (relating to trafficking in counterfeit labels for phonorecords, computer programs or computer program documentation or packaging and copies of motion pictures or other audiovisual works), section 2319 (relating to criminal infringement of a copyright), section 2319A (relating to unauthorized fixation of and trafficking in sound recordings and music videos of live musical performances),*
*(D) any offense involving fraud connected with a case under title 11 (except a case under section 157 of this title), fraud in the sale of securities, or the felonious manufacture, importation, receiving, concealment, buying, selling, or otherwise dealing in a controlled substance or listed chemical (as defined in section 102 of the Controlled Substances Act), punishable under any law of the United States,*

(2) "State" means any State of the United States, the District of Columbia, the Commonwealth of Puerto Rico, any territory or possession of the United States, any political subdivision, or any department, agency, or instrumentality thereof;

(3) "person" includes any individual or entity capable of holding a legal or beneficial interest in property;

(4) "enterprise" includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity;

(5) "pattern of racketeering activity" requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity;

(6) "unlawful debt" means a debt (A) incurred or contracted in gambling activity which was in violation of the law of the United States, a State or political subdivision thereof, or which is unenforceable under State or Federal law in whole or in part as to principal or interest because of the laws relating to usury, and (B) which was incurred in connection with the business of gambling in violation of the law of the United States, a State or political subdivision thereof, or the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate;

(7) "racketeering investigator" means any attorney or investigator so designated by the Attorney General and charged with the duty of enforcing or carrying into effect this chapter;

(8) "racketeering investigation" means any inquiry conducted by any racketeering investigator for the purpose of ascertaining whether any person has been involved in any violation of this chapter or of any final order, judgment, or decree of any court of the United States, duly entered in any case or proceeding arising under this chapter;

(9) "documentary material" includes any book, paper, document, record, recording, or other material; and

(10) "Attorney General" includes the Attorney General of the United States, the Deputy Attorney General of the United States, the Associate Attorney General of the United States, any Assistant Attorney General of the United States, or any employee of the Department of Justice or any employee of any department or agency of the United States so designated by the Attorney General to carry out the powers conferred on the Attorney General by this chapter. Any department or agency so designated may use in investigations authorized by this chapter either the investigative provisions of this chapter or the investigative power of such department or agency otherwise conferred by law.